THE STATE EX REL. AMERICAN STANDARD, INC., APPELLANT,
*v.* BOEHLER ET AL., APPELLEES.

[Cite as *State ex rel. Am. Std., Inc. v. Boehler,*
99 Ohio St.3d 39, 2003-Ohio-2457.]

(No. 2002–1391—Submitted April 15, 2003—Decided May 16, 2003.)

Per Curiam.

{¶ 1} Appellee-claimant, Robert E. Boehler, has an allowed workers' compensation claim arising from a 1988 industrial injury sustained while employed by appellant, American Standard, Inc. In 1997, appellee Industrial Commission of Ohio reinstated temporary total disability compensation ("TTC"). Early the following year, American Standard moved the commission to terminate TTC, stating that claimant had achieved maximum medical improvement ("MMI") and was gainfully employed.

{¶ 2} As to the latter claim of gainful employment, American Standard filed surveillance reports, photographs, and videotapes that documented claimant's activities at various apartment rental units that he owned. Through these, American Standard hoped to show that claimant was receiving rental income from these properties and was performing work activities there, which American Standard equated with gainful employment. It also alleged that claimant was engaged in physical activities that conflicted with his assertion of an inability to return to his former position of employment.

{¶ 3} American Standard's second claim was dealt a severe blow when its own examining physician, Dr. S.S. Purewal, examined the tapes and other evidence and concluded that the captured activities were *not* inconsistent with claimant's assertion that he could not return to his job as a tank loader/inspector. Dr. Purewal did, however, opine that the claimant had reached MMI—an opinion shared by Dr. Richard N. Kepple.

{¶ 4} The claimant rested on a series of C–84 physician reports supplemental prepared by attending physician Dr. Andrew J. Gase between November 13, 1997, and August 13, 1998. Collectively, these reports certified the claimant as unable to return to his former position from November 6, 1997, through December 13, 1998, due to his allowed back condition. When asked on these C–84s whether the condition had "reached a treatment plateau at which no fundamental functional or physiological change can be expected despite continuing medical or rehabilitative intervention," Dr. Gase checked the box for "no." When questioned on the same form as to whether claimant was "a candidate for vocational rehabilitation services focusing on return to work," he responded, "yes, if he [claimant] gets treatment for his severe neurogenic pain."

{¶ 5} At the commission hearing, surveillance evidence revealed claimant's presence at his rental units over a five-day period when other workers were clearly engaged in some sort of interior renovation. Claimant was occasionally seen instructing workers, "assisting with picking up things, passing tools," "helping to attach the paneling to the walls," and "scraping the walls."

{¶ 6} Claimant denied physical participation in any of the rental renovations alleged. He did, however, admit to being on the premises on the observed

occasions.   He also testified to receiving approximately $1,700 per month in rental income.

{¶ 7} A commission staff hearing officer denied American Standard's motion, writing:

{¶ 8} "Mr. Boehler is merely involved in a passive investment, as the owner of residential and commercial rental property * * *.   Claimant owned some of these rental properties prior to the injury allowed in this claim.   Prior to the injury, claimant was able to perform maintenance himself.   Subsequent to the injury, claimant had to hire independent contractors to perform the work at his rental properties.

{¶ 9} "The surveillance video submitted by the employer, as well as the surveillance photos they submitted, does *not* indicate that claimant was personally performing any work on his rental properties.   Instead, they corroborate claimant's testimony that he had hired outside contractors to perform the work and that he was sometimes on the job-site to observe the progress being made or to indicate what he wanted done.

{¶ 10} "This Staff Hearing Officer hereby finds that the aforesaid activities by the claimant were reasonable actions by a person who has a substantial capital investment in the form of a passive investment in rental properties and, furthermore, that said activities do *not* rise to the level [of] self-employment as alleged by the employer.   Therefore, it is the specific finding of this Staff Hearing Officer that claimant was NOT engaged in sustained remunerative employment from 5/16/96 through the present.

{¶ 11} "Furthermore, in regard to the employer's Motion, filed 2/2/98, which requested termination of Temporary Total Disability Compensation on the basis of both claimant's 'self-employment' and on a medical basis, the following findings are made.   * * * In regard to the medical evidence, the 7/9/98 report from an orthopedic specialist, S.S. Purewal, M.D., * * * specifically indicates that he had 'reviewed the video tapes that were made on 8/15/97, 2/13–/8 [sic] and 4/3/98. These tapes show Mr. Boehler moving about with some *limp on his right leg which he tends to drag.*'   Dr. Purewal went on to state that 'After reviewing the additional material discussed above, it is my opinion that this patient is *not capable of returning to his former position of employment* * * *.'

{¶ 12} "This Staff Hearing Officer further makes note of the fact that claimant originally underwent a multiple level lumbar hemi-laminectomy on 4/7/89.   Following this surgery, claimant had physical therapy, was rehabilitated and returned to work.   Claimant experienced an exacerbation and underwent a fusion on 10/21/92.   Again, claimant was rehabilitated and returned to work.   He was able to work until March of 1993, when his condition again deteriorated to the point that he was unable to work.   He participated in rehabilitation * * * and the

Rehabilitation Consultant found the claimant to be 'very motivated to participate in this rehabilitation program so he can return to work.'

{¶ 13} "Therefore, this Staff Hearing Officer finds claimant to be a highly motivated individual.

{¶ 14} "Claimant's attending physician, Andrew J. Gase, M.D., indicates, on the C–84 Attending Physician's Report dated August 13, 1998, that claimant has a 'chronic radiculopathy with foot drop' and 'increased pain radiating down left leg and almost entire right leg with right foot drop, unable to sit in chair with legs bent, difficulty raising right knee'. Dr. Gase then indicates that the claimant has *not* reached maximum medical improvement and that claimant is a candidate for vocational rehabilitation 'If he gets treatment for his severe neurogenic pain'.

{¶ 15} "Therefore, it is the finding of this Staff Hearing Officer that the claimant has *not* yet reached maximum medical improvement." (Emphasis sic.)

{¶ 16} Further consideration was denied.

{¶ 17} American Standard unsuccessfully petitioned the Court of Appeals for Franklin County for a writ of mandamus. Finding "some evidence" to support the commission's decision, the court of appeals denied the writ, prompting American Standard's appeal here as of right.

{¶ 18} TTC is prohibited to one who (1) has reached MMI, (2) has actually returned to some form of remunerative employment, or (3) is medically capable of returning to the former position of employment. *State ex rel. Ramirez v. Indus. Comm.* (1982), 69 Ohio St.2d 630, 632, 23 O.O.3d 518, 433 N.E.2d 586. American Standard's challenge has, at times, touched on all three, but has now narrowed to points (1) and (2). Ultimately, its position fails.

*Work Activities*

{¶ 19} Again, *Ramirez* forbids TTC to those who are medically able to return to the former position of employment or who actually are "working"—i.e., exchanging labor for pay—regardless of the nature or location of the work. *State ex rel. Parma Community Gen. Hosp. v. Jankowski*, 95 Ohio St.3d 340, 2002-Ohio-2336, 767 N.E.2d 1143. Disqualifying activities, therefore, have a medical or remunerative component. If the activities are medically inconsistent with the alleged inability to return to the former job, it matters not whether the claimant is paid for them. TTC is barred. Id. at ¶ 15. Paid activities bar TTC, regardless of the physical or medical nature of the work. Even sporadic activities of either type can foreclose TTC. *State ex rel. Blabac v. Indus. Comm.* (1999), 87 Ohio St.3d 113, 717 N.E.2d 336. Thus, claimant's actions mean nothing if American Standard cannot prove that they were either remunerative or medically inconsistent with the claim of inability to return to his former job. American Standard fails to do this.

{¶ 20} American Standard repeatedly notes the physicality of claimant's purported actions but never overtly accuses claimant of engaging in activity irreconcilable with his claimed inability to return to his former position. Perhaps that is because American Standard knows that it cannot prevail, given the opinion of its own physician, Dr. Purewal, that claimant's observed actions do not contradict his assertion that he cannot return to his old job.

{¶ 21} The remaining consideration—remuneration—is barely discussed by the employer. American Standard says only that in addition to his TTC, claimant was getting $1,700 per month. That amount, however, represents rental income not wages—a critical distinction.

{¶ 22} TTC compensates for the loss of earnings a claimant sustains while his or her injury heals. *State ex rel. Ashcraft v. Indus. Comm.* (1987), 34 Ohio St.3d 42, 44, 517 N.E.2d 533. This means that TTC is precluded when the claimant begins to earn again, i.e., when he or she is paid money in direct exchange for labor. *State ex rel. Ford Motor Co. v. Indus. Comm.,* 98 Ohio St.3d 20, 2002-Ohio-7038, 780 N.E.2d 1016, supports this, by refusing to disqualify claimants whose activities "produced money only secondarily" or were "only indirectly related to generating income." Id. at ¶ 23 and 24.

{¶ 23} The disputed amount in this case was not given in exchange for claimant's labor—it was paid pursuant to a contractual rental agreement. Certainly it can be argued that if claimant's apartments were not kept up, rental income could evaporate. There are, however, two key flaws in this logic. First, it runs counter to *Ford.* There, claimant's industrial injury not only removed him from his former job but also kept him from his side business of mowing lawns. Claimant was forced to hire others to do this work and paid them accordingly. Ford argued that claimant's act of signing payroll checks to these workers constituted "work" so as to foreclose TTC. We disagreed, writing that "this claimant's activities did not, in and of themselves, generate income; claimant's activities produced money only secondarily, e.g., claimant signed the paychecks that kept *his employees* doing the tasks that generated income." (Emphasis sic.) Id. at ¶ 23.

{¶ 24} In the case before us, rental upkeep generated income secondarily. It was the contractual relationship between claimant and his tenants that directly compelled the payment of money. It was not directly generated by the claimant's labor.

{¶ 25} Second, American Standard confuses the concept of remuneration with claimant's physical presence at the rental site. If claimant had never visited his properties and had never participated in their rental or upkeep, leaving those tasks to others, claimant would still have received his rental income. Few would argue that in such a case, TTC would be precluded. This indeed suggests that

the pivotal point of American Standard's position is claimant's physical presence at the rental units. Nothing, however, prevents claimant from going there. The only thing that *is* barred is claimant's participation in any activities that are medically inconsistent with his allegation of an inability to return to his former position of employment or that *directly* generate income, and there is evidence of neither here.

{¶ 26} *Ford* acknowledged the perils of situations such as that at issue, cautioning that "this rationale must be applied on a case-by-case basis and only when a claimant's activities are minimal. A claimant should not be able to erect a facade of third-party labor to hide the fact that he or she is working." Id., 98 Ohio St.3d 20, 2002-Ohio-7038, 780 N.E.2d 1016, at ¶ 24.

{¶ 27} We conclude, therefore, that the commission did not abuse its discretion in finding that claimant's actions did not constitute sustained remunerative employment that would bar TTC.

*MMI*

{¶ 28} *Ramirez* held that TTC is payable only to those with temporary disabilities. Therefore, a claimant who has reached MMI forfeits TTC. MMI describes a condition that has become permanent, i.e., one that will, " 'with reasonable probability, continue for an indefinite period of time without any present indication of recovery therefrom.' " *Vulcan Materials Co. v. Indus. Comm.* (1986), 25 Ohio St.3d 31, 33, 25 OBR 26, 494 N.E.2d 1125, quoting *Logsdon v. Indus. Comm.* (1944), 143 Ohio St. 508, 28 O.O. 429, 57 N.E.2d 75, paragraph two of the syllabus. Dr. Gase specified that the claimant was not MMI, and the commission relied on his opinion in awarding TTC. American Standard criticizes that reliance, arguing that (1) other evidence indicates MMI and (2) Dr. Gase's report is flawed. Neither challenge has merit.

{¶ 29} The commission's decision need only be supported by "some evidence." *State ex rel. Burley v. Coil Packing, Inc.* (1987), 31 Ohio St.3d 18, 31 OBR 70, 508 N.E.2d 936, syllabus. Thus, the presence of contrary evidence is immaterial, so long as the "some evidence" standard has been met. And, in our case, Dr. Gase's reports certainly satisfy that requirement.

{¶ 30} Contrary to American Standard's representation, Dr. Gase's C–84s are not fatally ambiguous or equivocal. American Standard argues that Dr. Gase's rejection of MMI is contradicted by his physical findings, which, American Standard contends, demonstrate MMI. This fails for two reasons. First, the commission is the exclusive interpreter of evidence presented. *State ex rel. Middlesworth v. Regal Ware, Inc.* (2001), 93 Ohio St.3d 214, 216, 754 N.E.2d 774. Thus, the commission could freely interpret the evidence as it chose and was not required to adopt American Standard's reading.

{¶ 31} Moreover, even if American Standard's reading was accepted, it must still be balanced against Dr. Gase's express certification that claimant has not reached MMI. As we have said, when evidence can be read in two different ways, the commission does not abuse its discretion in choosing one over the other. *State ex rel. Copeland v. Indus. Comm.* (1990), 53 Ohio St.3d 238, 559 N.E.2d 1310.

{¶ 32} Finally, American Standard contends that it is inappropriate to allow Dr. Gase's recommendation for vocational rehabilitation to negate a finding of MMI. It relies on this quote from the court of appeals in *State ex rel. Matlack, Inc. v. Indus. Comm.* (1991), 73 Ohio App.3d 648, 659, 598 N.E.2d 121:

{¶ 33} "[T]here is a distinction in the case law between physical rehabilitation and occupational-type therapy related to the condition's improvement, and vocational rehabilitation or job training related to claimant's vocational improvement. The former type of rehabilitation can signify continuing possibility of medical improvement while the latter cannot."

{¶ 34} American Standard uses well-intentioned physician responses to bureau-designed questions as a trap for the unwary. The bureau's C–84 asks—without qualification of the word "rehabilitative"—"Has the work related injury(s) or disease reached a treatment plateau at which no fundamental functional or physiological change can be expected despite continuing medical or rehabilitative intervention?" The physician is required to check "yes" or "no." The form then asks, "Is the injured worker a candidate for vocational rehabilitation services focusing on return to work?"

{¶ 35} Dr. Gase answered "no" to the former and "yes" to the latter. This is not inconsistent. The initial negative response indicates that claimant's condition can be improved by further medical or rehabilitative measures. Thus, a "yes" answer to the second question is completely consistent. American Standard, however, wishes to focus exclusively on one thing—the presence of a single word, "vocational" before the word "rehabilitation" in Question 2. We are not persuaded that the first question dealing squarely with the issue of MMI has been made so ambiguous by a single word in the second question. In this case, Dr. Gase affirmed that rehabilitation would facilitate the claimant's return to work. We find, therefore, that the commission did not abuse its discretion in determining that claimant had not reached MMI.

{¶ 36} The judgment of the court of appeals is affirmed.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

Scott, Scriven & Wahoff, L.L.P., Timothy E. Cowans and Richard Goldberg, for appellant.

Jim Petro, Attorney General, and Gerald H. Waterman, Assistant Attorney General, for appellee Industrial Commission.

Stewart Jaffy & Assoc. Co., L.P.A., Stewart R. Jaffy and Marc J. Jaffy, for appellee Robert E. Boehler.