DECISION
{¶ 1} Relator, Ford Motor Company, Sharonville Transmission Plant ("relator" or "Ford") seeks a writ of mandamus directing the Industrial Commission of Ohio ("commission") to vacate an order granting permanent total disability ("PTD") *Page 2 
compensation to Emma R. Johnson ("claimant") and to enter an order denying PTD compensation to claimant.
 {¶ 2} Pursuant to former Loc. R. 12(M) of the Tenth District Court of Appeals, [1] this court appointed a magistrate without limitation of authority specified in Civ. R. 53(C) to consider relator's cause of action. After examining the evidence, the magistrate issued a decision, wherein he made findings of fact and conclusions of law. In his decision, the magistrate recommended issuance of a writ of mandamus ordering the commission to amend an order of a staff hearing officer ("SHO"). (Attached as Appendix A.)
 {¶ 3} Pursuant to Civ. R. 53, relator has filed objections to the magistrate's decision, which the commission and claimant separately oppose. See, generally, Civ. R. 53(D)(3)(b). Relator advances the following objections for our consideration:
 Objection No. 1
 The Magistrate erred in finding the Industrial Commission did not abuse its discretion in determining that claimant's retirement from Ford was involuntary.
 Objection No. 2
 The Magistrate erred in finding that the Industrial Commission was free to ignore and overrule its October 12, 2001 decision that claimant was not permanently totally disabled.
 Objection No. 3
 The Magistrate erred in finding the report of Dr. Lutz constitutes some evidence upon which the Commission could rely to support the PTD award.
 {¶ 4} "Mandamus is a writ, issued in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law *Page 3 
specially enjoins as a duty resulting from an office, trust, or station." R.C. 2731.01. "Mandamus is an extraordinary writ that must be granted with caution." State ex rel. Liberty Mills, Inc. v. Locker
(1986), 22 Ohio St.3d 102, 103.
 {¶ 5} To be entitled to a writ of mandamus, relator must show: (1) a clear legal right to the relief requested; (2) the commission is under a clear legal duty to perform the act sought; and (3) relator has no plain and adequate remedy at law. State ex rel. Fain v. Summit Cty. AdultProbation Dept. (1995), 71 Ohio St.3d 658, citing State ex. rel. Howardv. Ferreri (1994), 70 Ohio St.3d 587, 589. Also, to constitute an adequate remedy at law, the alternative must be complete, beneficial, and speedy. State ex rel. Mackey v. Blackwell, 106 Ohio St.3d 261,2005-Ohio-4789, at ¶ 21, quoting State ex rel. Ullmann v. Hayes,103 Ohio St.3d 405, 2004-Ohio-5469, at ¶ 8, reconsideration denied,104 Ohio St.3d 1124, 2004-Ohio-7033.
 {¶ 6} "In matters involving the Industrial Commission, the determinative question is whether relator has a clear legal right to relief. Such a right is established where it is shown that the commission abused its discretion by entering an order which is not supported by any evidence in the record." State ex rel. Valley PontiacCo., Inc. v. Indus. Comm. (1991), 71 Ohio App.3d 388, 391, citingState ex rel Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. However, "where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is inappropriate." Valley Pontiac Co., Inc., at 391, citing State ex rel.Lewis v. Diamond Foundry Co. (1987), 29 Ohio St.3d 56. "The [industrial] commission alone shall be responsible for the evaluation of the weight and credibility of the evidence before it." *Page 4 State ex rel. Burley v. Coil Packing, Inc. (1987), 31 Ohio St.3d 18,20-21; see, also, State ex rel. Consolidation Coal Co. v. Indus.Comm. (1997), 78 Ohio St.3d 176, 177.
 {¶ 7} By its first objection to the magistrate's decision, relator challenges the magistrate's conclusion that the commission did not abuse its discretion in determining that claimant involuntarily retired from Ford.
 {¶ 8} "An employee who retires prior to becoming permanently and totally disabled is precluded from eligibility for permanent total disability compensation only if the retirement is voluntary and constitutes an abandonment of the entire job market." State ex rel.Baker Material Handling Corp. v. Indus. Comm. (1994), 69 Ohio St.3d 202, paragraph two of the syllabus, rehearing denied, 69 Ohio St.3d 1452, following and applying State ex rel. CPC Group, Gen. Motors Corp. v.Indus. Comm. (1990), 53 Ohio St.3d 209, modifying State ex rel. ChryslerCorp. v. Indus. Comm. (1991), 62 Ohio St.3d 193, and State ex rel.Consolidation Coal Co. v. Yance (1992), 63 Ohio St.3d 460. See, also,State ex rel. Staton v. Indus. Comm. (2001), 91 Ohio St.3d 407, 409-410
(discussing Baker and concept of a claimant's voluntary departure from employment); State ex rel. Crisp v. Indus. Comm. (1992),64 Ohio St.3d 507, 508, citing State ex rel. Rockwell Internatl. v. Indus. Comm.
(1988), 40 Ohio St.3d 44 (stating that "[a]n employee-initiated retirement that is not precipitated by industrial injury is considered `voluntary'"); State ex rel. Waddle v. Indus. Comm. (1993),67 Ohio St.3d 452, 456 (construing State ex rel. Diversitech Gen. Plastic FilmDiv. v. Indus. Comm. [1989], 45 Ohio St.3d 381) (finding thatDiversitech suggests that, as a general rule, "retirement" requires an affirmative act or declaration by the claimant). *Page 5 
 {¶ 9} Comparatively, "[a]n employee who retires subsequent to becoming permanently and totally disabled is not precluded from eligibility for permanent total disability compensation regardless of the nature or extent of the retirement." Baker Material Handling, at paragraph three of the syllabus, following State ex rel. Brown v. Indus. Comm. (1993),68 Ohio St.3d 45, rehearing denied (1994), 68 Ohio St.3d 1437, and distinguishing Chrysler Corp., supra, and Consolidation Coal Co., supra.
 {¶ 10} According to the stipulated evidence, on May 13, 1998, claimant sustained an industrial injury, and she has not worked since that time. After an initial application for Social Security Disability benefits apparently was denied, in 1999, a retirement board of administration, which was jointly administered by Ford and the United Automobile Workers ("UAW"), terminated retirement benefits that claimant had been receiving through a disability pension plan. In 1999, claimant also applied for PTD compensation, which the commission denied in 2001.
 {¶ 11} In January 2000, on a request for hearing, an administrative law judge ("ALJ") of the Social Security Administration granted social security disability benefits to claimant and concluded that, since May 13, 1998, claimant had been under a disability as defined by the Social Security Act and Regulations. In his decision, the ALJ referenced, among other things, disc herniations that were allowed claims for workers' compensation purposes following claimant's industrial injury in May 1998. After claimant had been awarded social security disability benefits, the Ford-UAW jointly administered retirement board reinstated disability benefits to claimant. In 2004, claimant submitted another application for PTD compensation, which the commission, through a SHO, later approved in 2005. *Page 6 
 {¶ 12} In his decision, the ALJ acknowledged that claimant's removal from the workforce was in part precipitated by claimant's industrial injury that she sustained in May 1998. Recognizing the ALJ's decision, and rejecting relator's contention that no causal relationship existed between claimant's inability to perform sustained remunerative employment and allowed conditions in the claim, the SHO found that the ALJ's decision was based in part on conditions recognized in claimant's claim. See, generally, Rockwell Internatl., supra, at syllabus (holding that "[w]hen a claimant's retirement is causally related to an industrial injury, the retirement is not `voluntary' so as to preclude eligibility for temporary total disability compensation"); State ex rel.Liposchak v. Indus. Comm. (1995), 73 Ohio St.3d 194, 195, reconsideration denied, 74 Ohio St.3d 1410 (stating that "[t]he existence of a causal relationship between an allowed condition and an inability to work underlies all successful requests for disability compensation"). Relying on, among other things, an examination by James T. Lutz, M.D., the SHO also found that claimant's orthopedic condition had reached maximum medical improvement ("MMI"), and that this condition precluded claimant from engaging in any type of sustained remunerative work activity.
 {¶ 13} Both the ALJ's decision and Dr. Lutz's report constitute "some evidence" before the commission, which the commission, through the SHO, has responsibility of evaluating for weight and credibility. SeeBurley, supra, at 20-21. As the evaluator of the weight and credibility of the evidence before it, the commission, through the SHO, therefore had authority to analyze the ALJ's decision to determine whether allowed industrial injuries resulted in claimant's involuntary retirement. Moreover, even assuming arguendo that the SHO should not have relied upon the ALJ's decision in reaching his *Page 7 
PTD determination, other evidence in the record, e.g., Dr. Lutz's evaluation, supports the SHO's determination that claimant involuntarily retired from Ford.
 {¶ 14} Accordingly, finding that the magistrate did not err, we overrule relator's first objection to the magistrate's decision.
 {¶ 15} By its second objection to the magistrate's decision, relator asserts: "The Magistrate erred in finding that the Industrial Commission was free to ignore and overrule its October 12, 2001 decision that claimant was not permanently totally disabled."
 {¶ 16} The doctrine of res judicata applies to administrative proceedings, State ex rel. B.O.C. Group v. Indus. Comm. (1991),58 Ohio St.3d 199, 200, citing Set Products, Inc. v. Bainbridge Twp. Bd. ofZoning Appeals (1987), 31 Ohio St.3d 260; Office of Consumers' Counselv. Pub. Util Comm. (1985), 16 Ohio St.3d 9, 10, but "`the defense of res judicata has only a limited application to compensation cases.'"B.O.C. Group, at 200, quoting Cramer v. Indus. Comm. (1944),144 Ohio St. 135, 138. Cf. Crisp, supra, at 508 (finding that whether a claimant voluntarily retired was res judicata and the claimant therefore was precluded from re-litigating this conclusively decided issue).
 {¶ 17} "`It is almost too obvious for comment that res judicata does not apply if the issue is claimant's physical condition or degree of disability at two entirely different times * * *. A moment's reflection would reveal that otherwise there would be no such thing as reopening for change in condition. The same would be true of any situation in which the facts are altered by a change in the time frame * * *.'"B.O.C. Group, at 201, quoting 3 Larson, Workers' Compensation Law (1989) 15-426,272(99) to 15-426,272(100), Section 79.72(f). See, also,State v. Youghiogheny Ohio Coal Co. v. Indus. Comm. (1992),65 Ohio St.3d 351 (finding that new and changed circumstances are not prerequisites for *Page 8 
industrial commission to consider subsequent application for PTD compensation after an initial denial).
 {¶ 18} Here, in 2001 when the commission denied claimant's 1999 application for PTD compensation, whether claimant had voluntarily retired was not an issue addressed by the commission in its denial of claimant's PTD application. Cf. Crisp, supra. After the commission denied claimant's 1999 application for PTD compensation, in 2004 claimant submitted another application for PTD compensation, which a SHO later approved in 2005. Because claimant's 2004 application for PTD compensation concerned a situation in which the facts were altered by a change in the time frame, we find that the magistrate correctly concluded that the SHO's 2005 order did not overrule, re-write, or impermissibly ignore the commission's 2001 order denying PTD compensation to claimant. We therefore overrule relator's second objection to the magistrate's decision.
 {¶ 19} By its third objection to the magistrate's decision, relator claims that the May 2004 report of James T. Lutz, M.D. fails to constitute "some evidence" and, accordingly, the magistrate erred by concluding that the commission properly could rely upon Dr. Lutz's report to support claimant's PTD award. Specifically, because Dr. Lutz referenced nonallowed conditions in his report, relator reasons that Dr. Lutz's opinion cannot constitute "some evidence" before the commission. Relying on State ex rel. Fields v. Indus. Comm. (1993),66 Ohio St.3d 437, relator further contends that medical evidence that relies, even in part, on nonallowed conditions cannot serve as the basis for an award of PTD compensation.
 {¶ 20} Although a claimant cannot be compensated for a disability unrelated to an allowed condition, see, e.g., Fields, supra, State exrel. LTV Steel Co. v. Indus. Comm. *Page 9 
(1992), 65 Ohio St.3d 22, State ex rel. Waddle v. Indus. Comm. (1993),67 Ohio St.3d 452, 454-455, "[t]his is not to say that the mere presence of nonallowed conditions automatically bars permanent total disability compensation." Id., at 455. In Waddle, the Supreme Court of Ohio observed that Ohio case law "[did] not inherently prohibit permanent total disability compensation to claimants concurrently disabled due to nonallowed conditions." Id.
 {¶ 21} Accordingly, the presence of nonallowed conditions does not automatically bar claimant's application for PTD compensation and, even if claimant were concurrently disabled due to nonallowed conditions, neither does the presence of nonallowed conditions inherently prohibit claimant from receiving PTD compensation. Id.
 {¶ 22} Here, our independent review finds that in his conclusions of law the magistrate aptly examined Dr. Lutz's report and properly concluded that Dr. Lutz's report constituted some evidence upon which the commission could rely to support a PTD award to claimant. Therefore, we overrule relator's third objection to the magistrate's decision.
 {¶ 23} Finally, although no party has challenged the magistrate's conclusion that the January 6, 2004, report of H. Paul Lewis, M.D. fails to constitute some evidence that claimant's industrial injury reached permanency or maximum medical improvement (Magistrate's Decision, at ¶ 103), upon independent review, we find that the magistrate properly applied the relevant law to the facts in reaching this conclusion. See, generally, State ex rel. American Standard, Inc. v. Boehler,99 Ohio St.3d 39, 2003-Ohio-2457, at ¶ 28, quoting Vulcan Materials Co. v.Indus. Comm. (1986), 25 Ohio St.3d 31, 33, quoting Logsdon v. Indus.Comm. (1944), 143 Ohio St. 508, paragraph two of the syllabus *Page 10 
(stating that "MMI describes a condition that has become permanent, i.e., one that will, `"with reasonable probability, continue for an indefinite period of time without any present indication of recovery therefrom"'"); State ex rel. Matlack, Inc. v. Indus. Comm. (1991),73 Ohio App.3d 648, 655 (observing that "[w]hen * * * stabilization has been reached and no further improvement is probable, then the condition is permanent and claimant can seek compensation for types of permanent disability, namely * * * permanent total disability compensation for total impairment of earning capacity").
 {¶ 24} Accordingly, following independent review pursuant to Civ. R. 53, we find that the magistrate has determined the pertinent facts and applied the relevant law to these facts. Finding that Dr. H. Paul Lewis's report of January 6, 2004 states that claimant complained of "constant low back" pain, not "constant law back" pain as the magistrate found, we amend the magistrate's nineteenth finding of fact. Also, we observe that in his discussion of State ex rel. Consolidation Coal Co.v. Yance, supra, in his conclusions of law, the magistrate incorrectly stated that in 1986 a district hearing officer ("DHO") found that the claimant's retirement was "voluntary" because it was injury-induced. Rather, in Yance, the DHO found that the claimant's retirement was "involuntary." See id. at 461. We further observe that Ohio Adm. Code 121-3-34 has been amended, effective June 1, 2008; however, division (D)(1)(f), as cited by the magistrate in his conclusions of law, was unaffected by the June 2008 amendment. See 2007-2008 Ohio Monthly Record 2-3155. As amplified herein, we therefore adopt the magistrate's decision as our own, including the magistrate's findings of fact and conclusions of law. *Page 11 
 {¶ 25} For reasons set forth above, we overrule all of relator's objections to the magistrate's decision. Agreeing with the magistrate's recommendation, we issue a writ of mandamus that is limited to ordering the commission to amend its SHO's order of February 16, 2005, by eliminating reliance upon H. Paul Lewis, M.D.'s report and starting claimant's PTD award as of May 4, 2004, which is the date of James T. Lutz, M.D.'s examination. Finding that relator has failed to show a clear legal right to the relief requested or that the commission is under a clear legal duty to perform the act sought by relator, we deny relator's request for a writ of mandamus ordering the commission to vacate its award of PTD compensation to claimant.
Objections overruled; limited writ granted.
TYACK and T. BRYANT, JJ., concur.
T. BRYANT, J., retired of the Third Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 12 
 APPENDIX A MAGISTRATE'S DECISION
Rendered on May 30, 2008
 {¶ 26} In this original action, relator, Ford Motor Company, Sharonville Transmission Plant ("relator" or "Ford"), requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its award of *Page 13 
permanent total disability ("PTD") compensation to respondent Emma R. Johnson ("claimant"), and to enter an order denying said compensation.
Findings of Fact: {¶ 27} 1. Claimant has three industrial claims arising out of her employment with relator, a self-insured employer under Ohio's workers' compensation laws.
 {¶ 28} 2. On June 5, 1989, claimant sustained an industrial injury which is allowed for "right wrist sprain," and is assigned claim number L224950-22.
 {¶ 29} 3. On January 5, 1994, claimant sustained an industrial injury which is allowed for "left supraspinatus tendonitis and left lateral epicondylitis," and is assigned claim number L255437-22.
 {¶ 30} 4. On May 13, 1998, claimant sustained an industrial injury which is allowed for "lumbar strain; herniated disc L4-5 and L5-S1," and is assigned claim number 98-417901.
 {¶ 31} 5. Claimant has not worked since May 13, 1998.
 {¶ 32} 6. Ford and United Automobile Workers ("UAW") jointly administer a disability pension plan through a "Retirement Board of Administration" ("retirement board").
 {¶ 33} 7. On October 28, 1998, claimant was examined at the request of the retirement board by James J. Kreindler, M.D. In his report to the retirement board, Dr. Kreindler states:
 I saw Ms. Johnson on October 28, 1998 for a disability evaluation. She has a diagnosis of herniated lumbar disc of the L4-5 and L5-S1 discs. The herniations are reported to be "fairly large" by MRI, with impingement on the nerve roots at those levels. She is currently on narcotic pain medications. * * * *Page 14 
 * * *
 Impression: I feel Ms. Johnson is permanently disabled at this time. She is unable to lift, bend, twist, stand, sit or walk for long periods of time, at present. She may improve with physical therapy, time and possibly surgery but will not be able to return to work in her present condition.
 {¶ 34} 8. In November 1998, the retirement board found claimant to be "totally and permanently disabled" under terms of the Ford-UAW pension plan.
 {¶ 35} 9. Apparently, claimant's application for Social Security Disability Benefits was initially denied. Accordingly, in October 1999, the retirement board terminated her disability benefits.
 {¶ 36} 10. Claimant appealed the initial decision of the Social Security Administration that denied her application for Social Security Disability Benefits.
 {¶ 37} 11. On August 5, 1999, claimant filed with the commission an application for PTD compensation.
 {¶ 38} 12. On December 6, 1999, at the commission's request, claimant was examined by William R. Fitz, M.D., who opined: "I do believe she could return [to her] normal occupation as a forklift operator."
 {¶ 39} 13. On January 21, 2000, an administrative law judge ("ALJ") of the Social Security Administration issued a decision granting claimant's application for Social Security Disability Benefits.
 {¶ 40} 14. Under the heading "Evaluation of the Evidence," the ALJ decision states:
 After a thorough evaluation of the entire record, it is concluded that the claimant has been disabled since May 13, 1998, and met the insured status requirements of *Page 15 
the Social Security Act on that date and thereafter, through December 31, 2002.
 The claimant was 48 years old on the date her disability began. The claimant has a 12th grade education. The claimant has not engaged in any substantial gainful activity since the disability onset date.
 The claimant has the following impairments which are considered to be "severe" under the Social Security Act and Regulations: degenerative disc disease in the lumbar spine, DeQuervain's syndrome and right tennis elbow and chronic pain syndrome. These impairments prevent the claimant from performing even sedentary work.
 There is no indication the claimant has worked since the alleged onset date and the Administrative Law Judge so finds.
 Medical evidence shows as early as 1992, the claimant complained of problems with the right wrist which were thought to be due to cumulative trauma[.] * * * In March, 1994, she was treated for tendonitis in the left arm[.] * * *
 The claimant's problems in the lumbar spine became evident on March 14, 1998 when she hurt her lower back driving a forklift truck. On admission to a hospital on May 14, 1998, acute lumbosacral strain was diagnosed[.] * * * Following this, she complained of low back pain and straight-leg raising was positive in June, 1998. She received epidural steroid injections in August, 1998 but this did not relieve her pain[.] * * *
 An MRI of the lumbar spine of June 24, 1998 showed disc herniation at L5-S1 and pinching on the nerve root and a larger disc herniation at L4-5[.] * * *
 The claimant's treating orthopedist, Dr. Stern, noted on July 17, 1998 that the claimant's disc herniations were both fairly large and that he believed that there was a direct relationship between her back injury and the current diagnosis of disc herniations at L4-5 and L5-S1[.] * * *
 Records from a treating neurosurgeon, Dr. Robbins, included a note from October 19, 1998 stating the claimant's pain was getting progressively worse[.] * * * *Page 16 
 A treating physician, Dr. Siegel, on October 23, 1998 limited the claimant to sitting 15 minutes, standing ten minutes, walking five minutes and lifting only five pounds. Lumbo-sacral strain was diagnosed. It was stated the claimant needed a cane for walking short distances up to 50 feet. It was noted that these limitations took into account only the claimant's back problems, not a previous diagnosis of carpal tunnel syndrome[.] * * *
 Dr. Siegel prescribed physical therapy but after four treatment sessions on December 3, 1998, it was felt that she had made no progress and treatment seemed to aggravate her symptoms[.] * * *
 On October 7, 1999, the claimant was seen by a consulting specialist in physical medicine and rehabilitation, Dr. Wachendorf. The claimant complained of low back pain, right hand pain, and left arm pain. She could sit only five to ten minutes, stand for ten minutes, and could walk about 100 feet using a cane. She stated her pain dated to the accident on May, 1998. Pain radiated from the lower back to both legs. Treatment such as physical therapy, a TENS Unit and back brace had not helped her. She also complained of right hand pain since 1978 and 1989 while working as an assembler. She had left arm pain since 1984. The doctor noted the claimant exhibited many pain behaviors. Range of motion was limited. There was extreme paraspinal muscle tightness. Straight-leg raising could not be performed in the supine position due to pain. Chronic back pain with MRI findings of herniated discs at L4-5 and L5-S1, right hand pain with DeQuervain[']s syndrome and right tennis elbow with these conditions possibly on the left as well and chronic pain syndrome were diagnosed. The doctor felt the claimant could lift only five pounds occasionally. She could only walk one hour out of eight in an eight hour day and ten minutes without interruption. She could sit four hours out of an eight hour day. She walked in a bent forward position[.] * * *
 The statements of both the treating and consulting physician show clearly that the claimant is severely impaired due to degenerative disc disease and her arm problems and that these impairments, while not meeting or equalling [sic] any listed impairment in severity, would be sufficient to reduce her to less than sedentary work. Both the consulting and treating physicians agreed that the claimant was limited to lifting only five pounds. Additionally, she cannot perform the *Page 17 
walking, standing, or even sitting requirements of sedentary work in the opinions of both the treating and consulting physicians. These opinions were based on objective medical evidence such as the MRI showing a herniated disc at L4-5 and L5-S1 and thus entitled to controlling weight. It is clear, therefore, that the claimant cannot perform more than a very limited range of sedentary work.
 The claimant's past relevant work was in transmission assembly and as a forklift driver. As described in her vocational report * * * these jobs required at least the physical exertional capacity of light to medium work. The Administrative Law Judge finds the claimant cannot perform these jobs due to her limitation to less than the sedentary residual functional capacity and she has no transferable job skills from them.
 {¶ 41} 15. Under the heading "Findings," the ALJ decision states:
 After consideration of the entire record, the Administrative Law Judge makes the following findings:
 1. The claimant met the insured status requirements of the Act on May 13, 1998. The claimant has not performed any substantial gainful activity since May 13, 1998.
 2. The claimant's impairments which are considered to be "severe" under the Social Security Act are degenerative disc disease in the lumbar spine, DeQuervain's syndrome and right tennis elbow and chronic pain syndrome.
 3. The claimant's impairments do not meet or equal in severity the appropriate medical findings contained in 20 CFR Part 404, Appendix 1 to Subpart P (Listing of Impairments).
 4. The claimant's allegations are found to be credible.
 5. The claimant's impairments prevent her from performing even sedentary work.
 6. The claimant is unable to perform her past relevant work.
 7. The claimant was 48 years old on the date disability began, which is defined as a younger individual. The claimant has a high school education. *Page 18 
 8. The claimant does not have transferable skills to perform other work within her physical and mental residual functional capacity.
 9. Based upon the claimant's residual functional capacity, and vocational factors, there are no jobs existing in significant numbers which she can perform. This finding is based upon Section 201.00(h) of the Medical-Vocational Guidelines, 20 CFR Part 404, Appendix 2 to Subpart P.
 10. The claimant has been under a disability as defined by the Social Security Act and Regulations since May 13, 1998.
 16. Under the heading "Decision," the ALJ decision states:
 Based on the Title II application filed on October 8, 1998, the claimant is entitled to a period of disability beginning on May 13, 1998, and to disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act, and the claimant's disability has continued through at least the date of this decision.
 {¶ 42} 17. In March 2000, the retirement board reinstated disability benefits under the Ford-UAW pension plan.
 {¶ 43} 18. Following an October 12, 2001 hearing, a staff hearing officer ("SHO") issued an order denying claimant's PTD application. The SHO's order of October 12, 2001 concludes:
The Staff Hearing Officer finds that the claimant's condition has reached maximum medical improvement. The Staff Hearing Officer further finds, based upon the report of Dr. Fitz, that the industrial injury does not prevent the claimant from returning to work at her former position of employment. The Staff Hearing Officer therefore finds that the claimant is not permanently and totally disabled. * * *
 {¶ 44} 19. On January 26, 2004, claimant filed with the commission another PTD application. In support, claimant submitted a report dated January 6, 2004 from her treating neurosurgeon, H. Paul Lewis, M.D. In his report, Dr. Lewis states: *Page 19 
 I next examined her on May 10, 2002 at which time she again noted pain in the low back, left leg, and buttocks. She also noted numbness in the left leg, and tingling in the buttocks and lower back. The severity had increased with time, and it was worse now than it had ever been. She described the pain as stabbing, aching, and burning in the buttock and leg. She indicated that any movement such as sitting and walking seemed to aggravate the problem, and she noted numbness in the left leg, and tingling in the buttocks and lower back.
 I again reviewed the MRI scan, and results of a computerized tomography of the spine from Mercy Hospital Fairfield that were done on June 25, 1998. This revealed evidence of a herniated disc at L5-S1, and a left paracentral area with impingement of the thecal sac.
 By June 12, 2002, she was back in the office with an MRI scan that revealed evidence of an L4-5, L5-S1 root compression. She wished to proceed with surgery, and we determined to go ahead with a two-level posterior lumbar interbody fusion at L4-5 and L5-S1, using Ray threaded fusion cages.
 She was back in the office on January 2, 2003, having finally obtained approval for the surgical procedure. Accordingly, on February 12, 2003, she underwent a posterior lumbar interbody fusion at L4-5 and L5-S1 with threaded fusion cages.
 In visits on February 19 and March 7, 2003, she was complaining of neuropathic pain in the lower extremities, and she had a tender left knee. Both hips and her left groin were also tender, and she stated that she felt a drawing sensation in her left calf. Her low back pain was nearly gone. We continued to monitor her progress throughout April, and by May 23, 2003, she returned to the office, doing fairly well. Her films looked excellent, and there was no sign of motion on the flexion extension films.
 By July 10, 2003 she was ambulating with a cane, and indicated that she was doing some of the exercises requested, although some of them were giving her pain. By August 6, 2003 she was in the office, complaining of constant law back, left buttock, and leg pain, with leg pain being "like fire" with paresthetic pain in the lower leg and arch of the left foot. She also complained of numbness in the *Page 20 
great toe and second toe. She lastly noted the occurrence of "flashes" of pain in the right groin and leg. By August 20, 2003 she was continuing to have problems with pain, was in physical therapy, and was improving slowly. This pain continued through September 10, 2003 and October 8, 2003.
 She was last in the office on November 19, 2003, still with neuropathic pain in the left lower extremities, and was still taking Neurontin 2400 mg qd and 40 Oxycontin bid. She was also taking Amitriptyline and Lidoderm patches.
 It is my opinion, within reasonable medical certainty, that this patient has suffered from herniated lumbosacral disc, and displacement with radiculopathy at the levels of L4-5 and L5-S1. It is further my opinion, within reasonable medical certainty, that this patient has suffered from herniated lumbosacral discs at L4-5 and L5-S1 with radiculopathy and neuropathic pain as a result. It is further my opinion, within reasonable medical certainty, that this condition, as well as the posterior lumbar interbody fusion with threaded cages and resulted neuropathy, are directly and causally related to the industrial injury. Upon last seeing her, I felt that her pain would resolve with time, and with her being very patient, she has been recovering satisfactorily.
 It is further my opinion, within reasonable medical certainty, that this patient is totally disabled from performing any substantial remunerative employment. Further, her prognosis is guarded until we see how she responds to the prescribed treatment.
 {¶ 45} 20. On May 4, 2004, at the commission's request, claimant was examined by James T. Lutz, M.D. In his three-page narrative report, under "History of Present Illness," Dr. Lutz wrote:
 * * * She also complains of intermittent, but daily right wrist pain, which she rates up to a 6 on the Visual Analog Scale, with numbness and tingling of the right wrist and hand, although this is probably related to her non-allowed right carpal tunnel syndrome. Her right wrist symptoms are aggravated with exertional activities such as lifting, pushing and pulling, repetitive use of the right upper extremity, and with weather changes. * * *
 {¶ 46} 21. Under "Physical Examination," Dr. Lutz wrote: *Page 21 
 * * * Examination of the left elbow revealed no structural deformities, swelling, or discoloration. Tenderness was noted directly over the lateral epicondyle. Manual muscle testing of the elbow flexors, extensors, supinators and pronators was excellent at 5/5, although the claimant did complain of pain over the lateral epicondylar area with both supination and pronation against resistance.
 The elbow exhibited full range of motion with flexion 140 degrees, extension 0 degrees, and supination and pronation 80 degrees each. Examination of the right wrist revealed no structural deformities, swelling or discoloration. Tenderness was noted over the midventral portion of the wrist. Manual muscle testing of the wrist extensors and flexors was excellent at 5/5. Related to her carpal tunnel syndrome, Tinel's, Phalen's, and the compression tests were all positive. Range of motion was full with flexion 60 degrees, extension 60 degrees, radial deviation 20 degrees, and ulnar deviation 30 degrees.
 {¶ 47} 22. Under "Discussion," Dr. Lutz wrote:
 * * * Emma Johnson sustained three industrial injuries whose claim allowances are noted above. According to the claimant, she has undergone a posterior interbody fusion at L4-5 and L5-S1 related to this injury of record. Other disability factors include her non-allowed right carpal tunnel syndrome, her age of 54, her last date of work being on 5/13/98, and a twelfth grade education.
 {¶ 48} 23. Under "Answers to Specific Questions," Dr. Lutz wrote:
 1. In my medical opinion, this claimant has reached maximum medical improvement with regard to each specified allowed condition of the three injuries of record discussed above. In my opinion, no fundamental, functional or physiologic change can be expected despite continued treatment and/or rehabilitation.
 2. Reference is made to the Fourth Edition of the AMA Guides Revised in arriving at the following impairment assessment. For injuries to the lumbosacral spine including lumbar strain and herniated disc L4-5 and L5-S1, for which the claimant has undergone multilevel fusion surgery, with evidence of radiculopathy: Utilizing table 72 on page 110 the claimant warrants a DRE category V, which equals a 25% whole person impairment. For right wrist sprain: For range of *Page 22 
motion, neurosensory, neuromotor and specific disorders: The claimant warrants a 0% impairment. I will allow a 1% whole person impairment for the claimant's ongoing pain. For left supraspinatus tendinitis: For range of motion of the left shoulder, utilizing figures 38, 41 and 44 the claimant warrants a 15% upper extremity impairment. For neurosensory, neuromotor and specific disorders the claimant warrants a 0% impairment. Utilizing table 3 on page 20 a 15% upper extremity impairment corresponds to a 9% whole person impairment. I will allow an additional 1% whole person impairment for the claimant's ongoing pain. Combining 9+1 the claimant warrants a 10% whole person impairment. For left lateral epicondylitis: For range of motion, neurosensory, neuromotor and specific disorders the claimant warrants a 0% impairment. I will once again allow a 1% whole person impairment for the claimant's ongoing pain. Combining 25+10+1+1 the claimant warrants a 35% whole person impairment.
 {¶ 49} 24. On May 4, 2004, Dr. Lutz also completed a physical strength rating form. On the form, Dr. Lutz marked with an "X" the preprinted statement: "This injured worker is not capable of physical work activity."
 {¶ 50} 25. Following a February 16, 2005 hearing, an SHO issued an order awarding PTD compensation starting January 6, 2004. The SHO's order explains:
 The injured worker submitted a 01/06/2004 report from Dr. Lewis who opined within reasonable medical certainty that the injured worker is totally disabled from performing any sustained remunerative employment.
 The injured worker was examined at the request of the Industrial Commission by Dr. Lutz on 05/04/2004 with regard to the allowed orthopedic conditions in the claim. Dr. Lutz clearly indicated the allowed conditions at the top of the order and gave percentage ratings only for the allowed conditions in the claim. Dr. Lutz indicated that the injured worker has a 35% whole person impairment rating and that the allowed conditions in the claim have reached maximum medical improvement. The Hearing Officer finds that the statement by Dr. Lutz "other disability factors include non-allowed right carpal tunnel syndrome. . . ." does not constitute a consideration of non-allowed conditions. The Hearing *Page 23 
Officer finds that Dr. Lutz properly confined himself to an opinion with regard only to the allowed conditions in the claim and concluded that the injured worker was unable to engage in physical work activity.
 The Staff Hearing Officer finds that the injured worker's orthopedic condition has reached maximum medical improvement and precludes the injured worker from returning to his [sic] former position of employment. The Hearing Officer finds that the injured worker's orthopedic condition is of such a severe nature that it precludes the injured worker from engaging in any type of sustained remunerative work activity.
 Therefore[,] the Hearing Officer grants the injured worker's application for permanent and total disability compensation filed 01/26/2004.
 The Hearing Officer rejects the employer's contention that there is no causal relationship between the injured worker's inability to perform sustained remunerative employment activity and the allowed conditions in the claim.
 The employer argued that the injured worker was granted social security permanent total disability benefits on 01/20/2000 based upon conditions which are not recognized in any of the injured worker's 3 workers' compensation claims. Subsequently, on 03/01/2000, the employer granted permanent total disability retirement based upon the award of social security. The employer also indicated that the injured worker's prior application for permanent total disability compensation was denied on 10/12/2001.
 The employer argued that the injured worker was removed from the workforce based upon non-allowed industrial conditions and retired on 03/01/2000 due to these non-allowed conditions and therefore the injured worker's inability to return to the workforce is due to non-allowed conditions and therefore is precluded from an award of permanent and total disability. The employer argues that permanent total disability compensation is precluded even if her condition subsequently deteriorates.
 The Hearing Officer finds that the social security decision is clearly based in part on conditions which are recognized in this claim including the injured worker's low back condition, including the herniated disc at L4-5 and L5-S1. *Page 24 
 The order states as follows: "the statements of both the treating and consulting physicians show clearly that the injured worker is severely impaired due to degenerative disc disease and her arm problems and that these impairments, while not meeting or equalling [sic] any listed impairment and severity, would be sufficient to reduce her to less sedentary work. Both the consulting and treating physicians agree that the injured worker was limited to lifting only 5 pounds. Additionally, she cannot perform walking, standing or even sitting requirements of sedentary work in the opinions of both the treating and consulting physicians. These opinions were based on the objective medical evidence such as the MRI showing a herniated disc at L4-5 and L5-S1 and thus entitled to controlling [sic] weight. It is clear, therefore[,] that the injured worker cannot perform more than a very limited range of sedentary work.
 The Hearing Officer finds that the decision is based in part on the injured worker's low back condition including the conditions of herniated disc which are currently allowed in the injured worker's claim. The Hearing Officer finds that the injured worker's retirement from Ford in March, 2000 was an involuntary retirement.
 Therefore, the Hearing Officer rejects the employer's argument that the injured worker was removed from the workforce due to non-allowed conditions and is precluded from alleging permanent total disability.
 The Hearing Officer finds[,] based solely on the allowed conditions in the claim, without consideration of non-allowed conditions, that the injured worker is permanently and totally disabled and unable to engage in any type of sustained remunerative work activity.
 {¶ 51} 26. On April 14, 2005, the commission mailed an order denying relator's request for reconsideration of the SHO's order of February 16, 2005.
 {¶ 52} 27. On December 31, 2007, relator, Ford Motor Company, Sharonville Transmission Plant, filed this mandamus action.
Conclusions of Law: *Page 25 {¶ 53} Several issues are presented: (1) whether claimant's retirement from Ford rendered her ineligible for PTD compensation; (2) whether the commission's denial of the first PTD application precludes a subsequent PTD award; (3) whether Dr. Lutz's reference to nonallowed conditions eliminates his PTD opinion as some evidence upon which the commission can rely; and (4) whether Dr. Lewis's report supports a finding that the industrial injuries are permanent, i.e., have reached maximum medical improvement ("MMI").
 {¶ 54} The magistrate finds: (1) claimant's retirement from Ford did not render her ineligible for PTD compensation; (2) the commission's denial of the first PTD application did not preclude a subsequent PTD award; (3) Dr. Lutz's reference to nonallowed conditions does not eliminate his PTD opinion as some evidence upon which the commission can rely; and (4) Dr. Lewis's report does not support a finding that the industrial injuries are permanent, i.e., at MMI.
 {¶ 55} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to eliminate reliance upon Dr. Lewis's report and to amend the start date of the PTD award, as more fully explained below.
 {¶ 56} Turning to the retirement issue, the second and third paragraphs of the syllabus of State ex rel. Baker Material HandlingCorp. v. Indus. Comm., 69 Ohio St.3d 202, 194-Ohio-437, state:
 An employee who retires prior to becoming permanently and totally disabled is precluded from eligibility for permanent total disability compensation only if the retirement is voluntary and constitutes an abandonment of the entire job market. (State ex rel. CPC Group, Gen. Motors Corp. v. Indus. Comm. [1990], 53 Ohio St.3d 209, * * * followed and applied; State ex rel. Chrysler Corp. v. Indus. Comm. [1991], *Page 26 62 Ohio St.3d 193, * * * and State ex rel. Consolidation Coal Co. v. Yance [1992], 63 Ohio St.3d 460, * * * modified.)
 An employee who retires subsequent to becoming permanently and totally disabled is not precluded from eligibility for permanent total disability compensation regardless of the nature or extent of the retirement. (State ex rel. Brown v. Indus. Comm. [1993], 68 Ohio St.3d 45, * * * followed; State ex rel. Chrysler Corp. v. Indus. Comm.
[1991], 62 Ohio St.3d 193, * * * and State ex rel. Consolidation Coal Co. v. Yance [1992], 63 Ohio St.3d 460, * * * distinguished.)
 {¶ 57} As its syllabus indicates, Baker Material modified State exrel. Consolidation Coal Co. v. Yance (1992), 63 Ohio St.3d 460, a case that relator cites to support its contention that claimant's retirement from Ford rendered her ineligible for PTD compensation. Relator does not cite Baker Material here.
 {¶ 58} In Consolidation Coal, Frank Yance filed an occupational disease claim two days before retiring from his employment as a miner. Yance's claim was allowed and temporary total disability ("TTD") compensation was awarded beginning January 1976.
 {¶ 59} In 1986, the employer moved to terminate TTD compensation on grounds that Yance had voluntarily retired. Before the motion was heard, Yance filed for PTD compensation. In December 1986, a district hearing officer ("DHO") denied the employer's motion to terminate, finding that the retirement was injury-induced and therefore voluntary. TTD compensation was continued pending the processing of the PTD application. The employer appealed the DHO's order but the appeal was never processed.
 {¶ 60} After an October 1998 hearing, Yance was awarded PTD compensation. The employer then filed a mandamus action in this court. This court denied the writ *Page 27 
based on a finding that the commission did not abuse its discretion in failing to address the retirement issue.
 {¶ 61} On appeal as of right to the Supreme Court of Ohio, the court reversed in part the judgment of this court and issued a limited writ returning the cause to the commission for further inquiry into the nature of Yance's retirement.
 {¶ 62} Regarding the retirement issue, the Consolidation Coal court stated:
 State, ex rel. Chrysler Corp., v. Indus. Comm. (1991), 62 Ohio St.3d 193, * * * recently declared that voluntary retirement precludes receipt of permanent total disability benefits. In this case, the circumstances precipitating claimant's retirement are particularly relevant since claimant retired before even alleging that he had an occupational disease. If claimant voluntarily removed himself from the workplace for reasons unrelated to his industrial condition, he is ineligible for permanent total disability, even if his condition later deteriorates to the point where claimant would be medically unable to work. While a commission district hearing officer once found that claimant's retirement was involuntary, appellant appealed that decision. The commission, however, never acted on that appeal and the issue was never conclusively resolved.
Id. at 461-462.
 {¶ 63} Here, the SHO determined that claimant's retirement from Ford was involuntary and, thus, the retirement did not render claimant ineligible for PTD compensation. The employer had argued that claimant's retirement from Ford was induced by nonallowed conditions and was therefore voluntary under Consolidation Coal. By analyzing the January 21, 2000 decision of the ALJ, the SHO determined that claimant's retirement was induced by the industrial injury. *Page 28 
 {¶ 64} According to the SHO's analysis, social security disability was awarded to claimant "in part on the injured worker's low back condition including the conditions of herniated disc which are currently allowed in the injured worker's claim."
 {¶ 65} Here, relator claims that the SHO's analysis is flawed and constitutes an abuse of discretion. Relator points out that the ALJ's decision finds: "The claimant's impairments which are considered to be "severe" under the Social Security Act are degenerative disc disease in the lumbar spine, DeQuervain's syndrome and right tennis elbow and chronic pain syndrome."
 {¶ 66} Relator points out that the industrial claim is not allowed for degenerative disc disease in the lumbar spine, DeQuervain's syndrome, right tennis elbow or chronic pain syndrome.
 {¶ 67} Given that the ALJ's finding lists the four nonallowed conditions as the cause of claimant's impairment, relator argues that claimant's retirement from Ford must be found to be voluntary because allegedly claimant's retirement was induced by the nonallowed conditions.
 {¶ 68} Parenthetically, the magistrate notes that State ex rel. Waddlev. Indus. Comm. (1993), 67 Ohio St.3d 452, holds that nonallowed medical conditions cannot be used to advance or defeat a claim for PTD compensation. Nevertheless, for purposes of addressing relator's challenge to the PTD award, the magistrate will assume that a retirement is voluntary if it is induced by nonallowed medical conditions. SeeState ex rel. Staton v. Indus. Comm. (2001), 91 Ohio St.3d 407
(claimant's retirement due to nonallowed conditions precluded eligibility for TTD compensation). Apparently, respondents do not disagree with this legal presumption. *Page 29 
 {¶ 69} Essentially, claimant argues that a commission determination of what medical conditions induced claimant's retirement from Ford is not strictly bound by the ALJ's finding that the impairment was caused by the four listed nonallowed conditions. Claimant argues that the commission was free to analyze the remainder of the ALJ's decision in determining whether one or more allowed conditions of the industrial claims induced claimant's retirement from Ford. The magistrate agrees with claimant's position that it was within the commission's discretion to analyze the entire ALJ decision in determining whether the industrial injuries induced the retirement.
 {¶ 70} To begin, the commission was not automatically bound by the ALJ's decision. The ALJ's decision constitutes evidence that the commission was required to consider and to weigh. The commission did just that.
 {¶ 71} Moreover, the SHO's analysis of the ALJ's decision is reasonable. Notwithstanding the ALJ's listing of the four nonallowed conditions, the decision also evaluates the medical evidence of record before the ALJ. The ALJ's discussion of the relevant medical evidence does not square with the ALJ's finding that severe impairment results from the four nonallowed conditions listed in the report.
 {¶ 72} The ALJ's decision notes the June 4, 1998 MRI of the lumbar spine showing "disc herniation at L5-S1 and pinching on the nerve root and a larger disc herniation at L4-5." That is a clear reference to an allowed condition of an industrial claim, although the ALJ's decision does not mention the industrial claim.
 {¶ 73} The ALJ notes that claimant's treating orthopedist, Dr. Stern, noted the disc herniations on July 17, 1998. The ALJ also notes that consulting specialist Dr. *Page 30 
Wachendorf attributed claimant's pain complaints and other symptoms to the herniated discs shown on the MRI.
 {¶ 74} Thereafter, in the next paragraph, the ALJ states that the statements of both the treating and consulting physician show clearly that the claimant is severely impaired due to "degenerative disc disease." The ALJ goes on to say in the same paragraph that the medical opinions were "based on objective medical evidence such as the MRI showing a herniated disc at L4-5 and L5-S1 and thus entitled to controlling [sic] weight."
 {¶ 75} Although "degenerative disc disease" is not an allowed condition of an industrial claim, it was clearly reasonable for the SHO to infer that the ALJ's reference to "degenerative disc disease" is a reference to the herniated disc at L4-5 and L5-S1 and is thus a reference to an allowed condition of an industrial claim.
 {¶ 76} It matters little whether, medically speaking, "degenerative disc disease" actually equates to the herniated discs. What matters is the reasonable inference that the ALJ interchangeably referred to those two conditions.
 {¶ 77} Clearly, the SHO's analysis of the ALJ's decision is not flawed and does not constitute an abuse of discretion.
 {¶ 78} Based upon the above analysis, the magistrate concludes that the commission did not abuse its discretion in determining that claimant's retirement from Ford was involuntary.
 {¶ 79} The second issue, stated generally, is whether the commission's denial of the first PTD application precludes a subsequent PTD award.
 {¶ 80} In its brief, relator asserts that the SHO's order of February 16, 2005 "basically overruled" the SHO's order of October 12, 2001. (Relator's brief, at 9.) In its *Page 31 
reply brief, relator points out that the SHO's order of October 12, 2001 denying the first PTD application was not challenged in mandamus and that it "must be accepted by the parties and this Court." (Reply brief, at 4.) Relator goes on to assert that "[t]he Staff Hearing Officer considering Claimant's second application for permanent total disability does not have the discretion to re-write or overrule the earlier decisions of the Social Security Administration or the Industrial Commission." Relator further asserts "[n]or was the Staff Hearing Officer free to reject or ignore the earlier decision of the Industrial Commission that the allowed conditions were non-disabling as of October 12, 2001." Id. at 5.
 {¶ 81} Relator fails to cite any case supporting the assertions above noted. However, it is perhaps suggested that the doctrine of res judicata precludes claimant from subsequently seeking a PTD award after the commission denied the first application and the denial was not challenged in mandamus. Relator's presumed reliance upon the doctrine of res judicata to bar the second PTD application is misplaced.
 {¶ 82} While the doctrine of res judicata applies to commission proceedings, it is limited by the commission's continuing jurisdiction over industrial claims under R.C. 4123.52. State ex rel. B.O.C. Group,General Motors Corp. v. Indus. Comm. (1991), 58 Ohio St.3d 199, 200. InState ex rel. Youghiogheny Ohio Coal Co. v. Indus. Comm. (1992),65 Ohio St.3d 351, the court held that commission denial of PTD compensation does not require the subsequent application to show new and changed circumstances in order to obtain a PTD award. However, there are indeed situations in which a prior commission finding can bar a subsequent PTD award. State ex rel. Crisp v. Indus. *Page 32 Comm., 64 Ohio St.3d 507, 1992-Ohio-128 (prior voluntary abandonment finding on issue of TTD entitlement precluded subsequent PTD award because of res judicata).
 {¶ 83} Here, it is obvious that the SHO's order of October 12, 2001 denying the first PTD application had no preclusive effect on the adjudication of the second PTD application. The SHO's order of October 12, 2001 and the SHO's order of February 16, 2005, adjudicate the claimant's PTD status during two separate periods of time. The SHO's order of October 12, 2001 determined that claimant could return to his former position of employment as of December 6, 1999, the date he was examined by Dr. Fitz. The SHO's order of February 16, 2005 determined that claimant was PTD beginning January 6, 2004.
 {¶ 84} Given the two entirely different time frames adjudicated, clearly, the SHO's order of October 12, 2001 had no preclusive effect upon the subsequent adjudication of claimant's second PTD application. See B.O.C. Group at 201 (res judicata does not apply if the issue is the claimant's physical condition or degree of disability at two entirely different times).
 {¶ 85} Accordingly, contrary to relator's assertions noted above, the SHO's order of February 16, 2005, does not overrule, rewrite, or impermissibly ignore the SHO's order of October 12, 2001.
 {¶ 86} The third issue, as previously noted, is whether Dr. Lutz's reference to nonallowed conditions eliminates his PTD opinion as some evidence upon which the commission can rely to support a PTD award. Specifically, relator claims that Dr. Lutz considered claimant's nonallowed right carpal tunnel syndrome in opining that claimant is not capable of physical work activity. The magistrate disagrees with relator's claim that *Page 33 
Dr. Lutz incorporated nonallowed conditions into his ultimate opinion that claimant is not capable of physical work activity.
 {¶ 87} Parenthetically, relator is incorrect to claim that Dr. Lutz's examination of the left elbow, including the lateral epicondyle, is an examination of a nonallowed condition. (Relator's brief, at 11.) The 1994 industrial claim is allowed for "left lateral epicondylitis." Thus, we would expect Dr. Lutz to examine the left elbow.
 {¶ 88} As previously noted, under "History of Present Illness," Dr. Lutz states that claimant's complaints of right wrist pain are "probably related to her nonallowed right carpal tunnel syndrome."
 {¶ 89} Under "Physical Examination," Dr. Lutz indicates that he examined the right wrist. Of course, we would expect Dr. Lutz to examine the right wrist given that the 1989 industrial injury is allowed for "right wrist sprain." Dr. Lutz did note that, related to her carpal tunnel syndrome, the Tinel's, Phalen's and compression tests were all positive.
 {¶ 90} The paragraph of Dr. Lutz's report devoted to the impairment rating process is significant in addressing relator's argument. For the right wrist sprain, range of motion, neurosensory, neuromotor and specific disorders, Dr. Lutz found zero percent impairment. However, he did add a one percent impairment for ongoing right wrist pain. Significantly, Dr. Lutz does not discuss the nonallowed carpal tunnel syndrome in his paragraph devoted to the impairment rating process. In the last sentence of the paragraph, Dr. Lutz finds that all the allowed conditions of the three industrial claims warrants a 35 percent whole person impairment. It is clear that the nonallowed right carpal tunnel syndrome was not rated for impairment and was not in any way considered in determining the 35 percent whole person impairment. *Page 34 
 {¶ 91} Under "Discussion," Dr. Lutz writes: "Other disability factors include her non-allowed right carpal tunnel syndrome, her age of 54, her last date of work being on 5/13/98, and a twelfth grade education." According to relator, because Dr. Lutz characterizes the nonallowed condition as a "disability factor," we must conclude that Dr. Lutz considered the nonallowed condition in reaching his ultimate conclusion that claimant is not capable of physical work activity.
 {¶ 92} While relator is correct in pointing out that, in the law of workers' compensation, a nonallowed condition is not a disability factor, it does not necessarily follow that Dr. Lutz's statement flaws his ultimate conclusion that claimant is permanently and totally disabled due to the industrial injuries. As previously noted, Dr. Lutz's paragraph devoted to the impairment rating process is instructive. While Dr. Lutz incorrectly called the nonallowed condition a "disability factor," it does not appear that he considered the nonallowed condition in reaching his ultimate conclusion.
 {¶ 93} In short, notwithstanding relator's challenges, Dr. Lutz's report is indeed some evidence upon which the commission can and did rely to support the PTD award.
 {¶ 94} The fourth issue, as previously noted, is whether Dr. Lewis's report supports a finding that the industrial injuries are permanent, i.e., have reached MMI.
 {¶ 95} Ohio Adm. Code 4121-3-34(D) sets forth the commission's guidelines for the adjudication of PTD applications. Ohio Adm. Code 121-3-34(D)(1)(f) provides:
 If, after hearing, the adjudicator finds that the injured worker's allowed medical condition(s) is temporary and has not reached maximum medical improvement, the injured worker shall be found not to be permanently and totally disabled because the condition remains temporary. * * *
 {¶ 96} Ohio Adm. Code 4121-3-32(A)(1) provides: *Page 35 
 "Maximum medical improvement" is a treatment plateau (static or well-stabilized) at which no fundamental functional or physiological change can be expected within reasonable medical probability in spite of continuing medical or rehabilitative procedures. An injured worker may need supportive treatment to maintain this level of function.
 {¶ 97} In State ex rel. Matlack, Inc. v. Indus. Comm. (1991),73 Ohio App.3d 648, 655, this court stated:
 The concept of permanency relates to the perceived longevity of the condition. Vulcan Materials Co. v. Indus. Comm. (1986), 25 Ohio St.3d 31[.] * * * A permanent condition is one which will, within reasonable probability, continue for an indefinite period of time without any indication of recovery therefrom. Id. at 33, * * * quoting Logsdon v. Indus. Comm. (1944), 143 Ohio St. 508[.] * * *
 Essentially, the Supreme Court of Ohio has adopted the ubiquitous maximum medical improvement ("MMI") test for purposes of temporary total disability compensation. As is the case in other states, temporary total benefits will be paid during the healing and treatment period for the condition until the claimant has reached some certain level of stabilization. See 2 Larson, The Law of Workmen's Compensation (1991), Sections 57.12(b) and (c). When this stabilization has been reached and no further improvement is probable, then the condition is permanent and claimant can seek compensation for types of permanent disability, namely, permanent partial disability compensation for partial impairment of earning capacity, and permanent total disability compensation for total impairment of earning capacity.
 {¶ 98} Here, citing Logsdon v. Indus. Comm. (1944), 143 Ohio St. 508, relator argues that Dr. Lewis never opined that the allowed conditions had reached permanency or MMI. On that basis, relator concludes that Dr. Lewis's report cannot constitute some evidence upon which the commission can rely to support the PTD award. (Relator's brief, at 10-11.)
 {¶ 99} Several points regarding Dr. Lewis's report support relator's argument. *Page 36 
 {¶ 100} First, Dr. Lewis opines that claimant is "totally disabled from performing any substantial remunerative employment." Absent from the opinion is the word "permanent." That is, Dr. Lewis fails to opine that claimant is permanently and totally disabled. Clearly, a claimant can be totally disabled from all sustained remunerative employment without that status being permanent.
 {¶ 101} In the last sentence of his report, Dr. Lewis states that claimant's "prognosis is guarded until we see how she responds to the prescribed treatment." Taber's Cyclopedic Medical Dictionary (20 Ed. 2005), 914, defines "guarded prognosis" as a "prognosis given by a physician when the outcome of a patient's illness is in doubt."
 {¶ 102} Moreover, Dr. Lewis reported that claimant was being treated for pain when she was last seen in his office on November 19, 2003. In that regard, Dr. Lewis states: "Upon last seeing her, I felt that her pain would resolve with time, and with her being very patient, she has been recovering satisfactorily."
 {¶ 103} Dr. Lewis's statement that he felt the pain would resolve with time, his guarded prognosis regarding her response to treatment, and his failure to state that the total disability is permanent, preclude even an inference that Dr. Lewis could have unequivocally opined that the industrial injury is permanent or at MMI. That is, Dr. Lewis's report simply fails to constitute some evidence that the industrial injury has reached permanency or MMI.
 {¶ 104} Given the above analysis, Dr. Lewis's report must be eliminated as some evidence supporting the PTD award. *Page 37 
 {¶ 105} While Dr. Lewis's January 6, 2004 report fails to support the PTD award, Dr. Lutz's report does support the PTD award. Unlike Dr. Lewis, Dr. Lutz opined that the industrial injuries are at MMI.
 {¶ 106} Given that Dr. Lutz examined claimant on May 4, 2004, the commission cannot start the PTD award as of January 6, 2004, the date of Dr. Lewis's report. Sole reliance upon the report of Dr. Lutz requires that the PTD award be amended to start the award as of May 4, 2004, the date of Dr. Lutz's examination.
 {¶ 107} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to amend its SHO's order of February 16, 2005, by eliminating reliance upon Dr. Lewis's report and starting the PTD award as of May 4, 2004, the date of Dr. Lutz's examination.
[1] After relator commenced this original action, this court's local rules were amended, effective June 1, 2008. See Loc. R. 20 of the Tenth District Court of Appeals. *Page 1